Farrow v. Commissioner NH DOC     CV-02-567-B    02/05/04
## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW HAMPSHIRE


Prayer Feather Farrow

        v.                                      Civil No. 02-567-B
                                                Opinion No. 2004 DNH 029
Phil Stanley, et al.


## REPORT AND RECOMMENDATION


The plaintiff, Prayer Feather Farrow, is an inmate at the

New Hampshire Department of Corrections ("NHDOC"), who is being

housed at the Northern New Hampshire Correctional Facility

("NCF"). He commenced this civil rights action alleging that the

defendants[1] have violated his rights under the First Amendment's

free exercise clause and under the Religious Land Use and

Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc et

seq. ("RLUIPA").

Before the Court for consideration is Farrow's Motion for a

Temporary Restraining Order and a Preliminary Injunction

(document no. 8) enjoining the Defendants from depriving him of

certain religious items and allowances, which he claims are

---

[1]The named defendants are Phil Stanley, the former
commissioner of NHDOC, Bruce Cattell, NCF Warden, Susan L. Young,
NCF Administrator of Programs and John Vinson, Esq., staff
attorney for NHDOC (collectively referred to as "Defendants").

necessary to the meaningful practice of his religion as a member of the Native American Sacred Circle ("NASC"). Defendants filed an objection. The motion was referred to me for review and to prepare a report and recommendation.

The Court held an evidentiary hearing on the Plaintiff's motion on October 16, 2003. Farrow testified on his own behalf, and supported his motion with affidavits from Donald Newell, a Penobscot elder, and Jermie Kline, an NCF inmate. See Pl. Ex. 1-2. The affidavits were entered into evidence without objection. Warden Cattell, Chaplin Michael Shaulis, and Susan Young testified on Defendants' behalf. Defendants submitted documentary evidence pertaining to NHDOC Policy and Procedure Directives ("PPD") on the issuance and control of resident property and religious programming, the NCF Chapel Services Calendar, and memorandums on the policies for inmate donations and for NCF Native American feasts. See Def. Ex. A-J.

After considering the evidence, and the relevant authorities, I find that Farrow has not demonstrated that he is likely to succeed on the merits of his claims. Therefore, I recommend that his motion for injunctive relief be denied.

## STANDARD OF REVIEW

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." CMM Cable Rep. v. Ocean Coast Prop., 48 F.3d 618, 620 (1st Cir. 1995) (citing Chalk v. U.S. Dist. Ct. Cent. Dist., 840 F.2d 701, 704 (9th Cir. 1988); Am. Hosp. Ass'n v. Harris, 625 F.2d 1328, 1330 (7th Cir. 1980)). Thus, if the court ultimately finds for the movant, a preliminary injunction provides the court with a method for preventing or minimizing any current or future wrongs caused by the defendant. CMM Cable Rep., 48 F.3d at 620.

A district court may grant a plaintiff's request for a preliminary injunction if the plaintiff satisfies a four-part test: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff will suffer irreparable harm if the injunction is not granted; (3) the injury to the plaintiff outweighs any harm which granting the injunction would inflict on the defendant; and (4) the public interest will not be adversely affected by the granting of the injunction. Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir. 2000); Public Serv. Co. v. Patch, 167

F.3d 15, 25 (1st Cir. 1998). In the First Circuit, the "sine qua non" of the preliminary injunction analysis is whether the movant can demonstrate a likelihood of success on the merits. Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993). To warrant preliminary injunctive relief, the movant's showing on the likelihood of success must be substantial. See I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998); TEC Eng'q Corp. v. Budget Molders Supply, 82 F.3d 542, 544 (1st Cir. 1996) (same). However, a party seeking injunctive relief must independently satisfy each of the four factors. Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981); Mass. Coalition of Citizens with Disabilities v. Civil Def. Agency & Off. of Emergency Preparedness, 649 F.2d 71, 74 (1st Cir. 1981). The Court applies this standard in reviewing Plaintiff's motion for injunctive relief.

BACKGROUND

I.   Farrow's Allegations

Farrow alleges that he was adopted by an elder of the Lakota Sioux Nation, and that as such he assumed obligations associated with the practice of that nation's religion. He claims that the Defendants have denied him the following religious items or

4

allowances that he needs to meaningfully practice his religion:

    (a) tobacco;

    (b) a sweat lodge;

    (c) certain medicines and herbs;

    (d) scheduled time for daily communal prayer;

    (e) traditional foods for various special religious days;

    (f) permission to wear feathers at all times; and

    (g) separate scheduled meeting times for members of the various Nations in NASC

Farrow alleges that he has exhausted the administrative grievance procedures available to him with regard to the above-listed requests, but the Defendants have refused to accommodate his concerns. Farrow claims that the Defendants have caused him to experience continuing emotional and spiritual pain because he is unable to meaningfully practice his religious beliefs.

## II. NCF Regulations That Affect NASC

Warden Cattell testified that NCF attempts to allow all inmates to practice their religion on a "reasonable and necessary" basis. Inmates are provided a controlled, systematic time for religious services that allows the institution to monitor what is occurring. Religious groups are scheduled for two hour blocks for services and separate two hour blocks for

5

religious education.  Inmates may request additional programming time when necessary.  Warden Cattell testified that security is required whenever inmates are moved within the facility, and that checks are required during group activities.

Inmate property, including religious property, is strictly regulated at NCF.  See PPD 9.2, Def. Ex. A.  The prison puts limits on the types and amounts of property inmates may have to control contraband, minimize conflicts between inmates, promote cleanliness and eliminate fire hazards.  The prison also needs to prevent nuisance, escape paraphernalia, and items that could be used as weaponry.

NFC attempts to substantiate the practices and religious items that are necessary for a faith group through the chaplain. Michael Shaulis,[2] who works at NCF part-time, advises management, leads worship services, and provides pastoral counseling to inmates and their families regardless of religion.  See NHDOC PPD 7.17, V(I)(1) ("The Chaplain shall schedule celebration of the sacramental rituals necessary to meet minimal requirements of a

---

[2]Shaulis testified that he is a Catholic Chaplain of Native American ancestry.  He testified that his great grandmother is a full-blooded Cree and that his grandfather was an Abenaki. Shaulis gained additional familiarity with Native American religions while serving on a Blackfoot reservation as a member of the military.  He has worked for NHDOC since March 1998.

given religious faith."). Shaulis also works with outside religious volunteers and oversees programs.[3]

Shaulis is responsible for working with the members of NCF's religious groups to help meet their religious needs. Inmates direct requests to the chaplain for services that are not being provided. Shaulis testified that he confers regularly with Native American practitioners Chief Pouliot, who works with the federal and state prison systems in Massachusetts, and Peter Newell, who is chief of a New Hampshire tribal counsel, in making recommendations to NCF regarding policies that affect NASC.

Cattell and Young testified that NCF does not support any specific religion by buying religious items. The chaplain attempts to find sources for donations for items requested by inmates. Ms. Shirley Bear of Hooksett, N.H., has agreed to be a benefactor of NASC. Ms. Bear has sent sweet grass, sage, kinnikinick, videos, and books for chapel use.

III. Defendants' Response to Farrow's Complaints

Defendants argue that Farrow has been allowed all of the items, services and practices that are mandated or central to his

---

[3]Susan Young testified that volunteers for NASC have been rare. NASC is treated differently from other groups to its benefit in that they are allowed to have group meetings even without a volunteer.

7

religion.  NASC has been scheduled time each week for communal religious activity and education.  NASC members are allowed to participate in community smudging and community prayer, which includes the use of a ceremonial pipe.  NASC is allowed to hold its ceremonies in a small confined area in front of the prison that has been designated off limits to the general population.

It is undisputed that NCF allows Farrow, and NASC as a group, to possess a number of religious items.[4]  The group items are stored in a locker under the chaplain's direction.  NASC members were previously allowed access to tobacco for religious purposes, but NHDOC and NCF have changed their policies and now prohibit the use of tobacco in the prison.  However, NASC members are allowed to use kinnikinick in their religious services as a tobacco substitute.

Farrow admits that some traditional Native American foods

_____

[4]Individual NASC members are allowed to possess a native choker, a beaded necklace, feathers, a bandana, and a medicine bag with personal items.  See Def. Ex. B, Attach. C, p. 1.  As a group, NASC is allowed to possess assorted sticks, beans, a blanket, cedar, cedar bark, cotton fabrics, cups, dream catchers, dried corn, a drum, drum beaters, leather, a leather medicine wheel, mandellas, native blue corn, a partial hawk wing, pictures, a pipe bundle, prayer flags, sage, shells, sinew, song books, spoons, squash seeds, sweet grass, talking sticks, tin with cedar, a turkey feather, and bitter root.  See Def. Ex. B, Attach. C, p. 3.

are part of the regular menu of foods provided to inmates at the NCF including beans, corn and squash.  He further admits that NCF holds four feasts per year for NASC members related to the winter solstice, spring equinox, summer solstice and the fall equinox. See Def. Ex. B, Attach. C, p. 1.

Defendants argue that there are legitimate penological interests supporting the denial of Farrow's specific requests, and that his requests pertain to items or allowances that are not necessary to the practice of his religion.  Additional facts pertaining to Farrow's claims are contained in the discussion.

DISCUSSION

I.   Section 1983

Farrow filed his complaint under 42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States has been violated, and (2) that the violation was committed by a person acting under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  In order to be held liable for a violation under § 1983, a defendant's conduct must have been a cause in fact of the alleged deprivation.  See Monell v. Dep't of Soc. Serv., 436 U.S. 658, 692 (1978); Soto v. Flores,

103 F.3d 1056, 1061-62 (1st Cir. 1997).

The premise of Farrow's § 1983 claim is that the defendants, acting under color of state law, have violated his rights under the First Amendment's free exercise clause,[5] as applied to the states through the Fourteenth Amendment, and that they have violated his rights under the RLUIPA. There is no reasonable dispute that Defendants' actions were taken under the color of state law, so I do not address that element further.

II. Free Exercise of Religion Claim

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285 (1948). However, a prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974); see also, Bell v. Wolfish, 441 U.S. 520, 545 (1979) ("prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in

---

[5]The relevant provision of the Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. I (hereinafter "Free Exercise Clause").

10

prison."). Those rights include the right to the free exercise of religion. <u>Cruz v. Beto</u>, 405 U.S. 319, 322 (1972). Prisons must provide all inmates reasonable opportunities to exercise their religious freedom. <u>Id.</u> at 322, n.2. When a prisoner raises Free Exercise Clause claims, the prisoner must "establish that a challenged policy restricts the inmate's free exercise of a sincerely held religious brief." <u>Brown-El v. Harris</u>, 26 F.3d 68, 69 (8th Cir. 1994); <u>Barnett v. Comm'r, N.H. Dept. of Corr.</u>, No. Civ. 98-305-JD, 2000 WL 1499490 (D.N.H. Apr. 26, 2000).

Even a sincerely held religious belief, however, must yield if contrary to prison regulations that are "reasonably related to legitimate penological interests." <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987); <u>see also</u>, <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 351-352 (1987) (finding that the Constitution does not require the prison to sacrifice legitimate penological objectives to satisfy an inmate's desire to exercise his religion so long as an inmate is not deprived of all forms of religious exercise). A regulation must have a logical connection to the legitimate governmental interests invoked to justify it. <u>Turner</u>, 482 U.S. at 89-90. That connection may not be "so remote as to render the policy arbitrary or irrational." <u>Id.</u>

11

Defendants do not challenge the sincerity of Farrow's religious beliefs. Therefore, for the purposes of Farrow's Free Exercise Clause claims, the relevant issue is whether NCF is providing Farrow a reasonable opportunity to practice his religion. Plaintiff's claims are examined in that context.

A. Access to Tobacco

Farrow asserts that he is not able to meaningfully practice his religion because the Defendants have denied him access to tobacco, which Farrow alleges he would use to make prayer ties, prayer flags, and in pipe ceremonies.[6] Cattell and Shaulis testified that tobacco is no longer allowed at NCF, however, because the prison has had numerous problems attempting to control its use. Previously when inmates were allowed to use tobacco for religious purposes, there were numerous instances of theft of tobacco and resale on the prison's black market. With kinnikinick, the prison does not need to have an officer watching over the ceremony the entire time because there are far fewer instances of stealing.

Shaulis testified that his consultations with Native American practitioners showed that kinnickinick is an acceptable

_____

[6]Shaulis testified that the pipe ceremony and smudging are common threads between all Native American religious services.

12

substitute for tobacco for Native American religious services. Shaulis testified that kinnikinick has a very low tobacco base and is less likely to be abused by inmates. According to Shaulis, tobacco is not essential to the practice of Farrow's religion since "the creator looks at the intent in the prayer not the offering in one's hand."

Donald Newell's affidavit on Native American traditions, submitted in support of Plaintiff's motion, does not necessarily contradict Shaulis' testimony.[7] In his affidavit, Newell stated that "the elimination or inability to produce an acceptable substitute" for certain items, would deny a person the opportunity to properly practice Native religion. Newell Aff. at 1, Pl. Ex. 2. Newell listed tobacco and kinnikinick among the items of concern. Newell does not address in his affidavit whether kinnikinick may be considered an acceptable substitute for tobacco. The Court finds that Farrow has not demonstrated by substantial evidence that the Defendants have denied him a meaningful opportunity to practice his religion by requiring him to use kinnikinick as a substitute for tobacco in religious practices.

_____

[7]It is unclear whether there is any relationship between Donald Newell and Peter Newell, with whom Shaulis consulted.

13

B.    Sweat Lodge

Donald Newell states in his affidavit that a sacred sweat lodge is used to cleanse the body and renew the spirit. He further provides that the sweat lodge "can be a place of healing and reflection and is an integral part of most Native religions from East to West." Newell Aff. at 2, Pl. Ex. 2. Farrow asserts that Defendants' security concerns regarding a sweat lodge at NCF are unwarranted or unjustified because at least thirty other prisons in the United States maintain sweat lodges.

Warden Cattell testified that the creation and maintenance of a sweat lodge is a great burden on a prison's resources and raises a number of security concerns. Among the security concerns that Cattell testified to were the need for inmates to use tools to cut wood for the sweat lodge. Once inside the sweat lodge, inmates are completely out of the sight of staff members and in a state of undress. Cattell further testified that he is aware from his twenty years of experience working in the Arizona prison system that assaults have occurred inside sweat lodges, and in particular he recalls a serious stabbing occurring in a sweat lodge in Arizona.

In addition to the prison's security concerns, Shaulis

14

contradicted Plaintiff's evidence regarding whether a sweat lodge is integral to the practice of his religion. According to Shaulis, a sweat lodge is more important to some nations than to others, and not all tribes use a sweat lodge. He testified that the traditions in the Eastern nations rely less on a sweat lodge.

The Court finds the evidence on the necessity of a sweat lodge to the practice of Farrow's religion inconclusive. Neither side presented evidence that specifically pertained to the religious practices of the Native American nation into which Farrow has been adopted. Because the evidence presented at the hearing was inconclusive and contradictory, the Court finds that Farrow has not demonstrated by substantial evidence that the Defendants have denied him a meaningful opportunity to practice his religion by refusing to allow a sweat lodge on the facility. Furthermore, the Court finds that Defendants have articulated sufficient reasons why Farrow's Free Exercise Clause right to the use of a sweat lodge is overborne by the detrimental effects on the prison's legitimate penological objectives.

C.   Access to Medicines and Herbs

Farrow argues that he has been deprived medicines and herbs that he needs for ceremonial religious use including red willow

15

bark, osha root, bitter root, yerba santa, pinion, desert sage, balsam and camomile. See Newell Aff., p. 1, Pl. Ex. 2. Farrow acknowledges that many of the herbs that he seeks would be used in prayers to treat common physical ailments such as stomach ailments and sore throat.

Shaulis testified that many of the herbs Plaintiff seeks have medicinal but not religious significance. NCF allows herbs that are the most common across the board in Native American traditions. The evidence showed that members of the NASC have been approved for the following items, among other things: cedar, cedar bark, dry corn, sage, shells, sinew, squash seeds, sweet grass and bitter root. Shaulis testified that he made recommendations to NCF as to the items that were necessary after consulting with Native American practitioners. The additional items that Farrow seeks may be used as part of ceremonies, but they are not necessary. Shaulis further testified that some of the items Plaintiff seeks could be physically harmful if used inappropriately. NCF allows inmates to possess over-the-counter medicines and herbs.

In light of the contradictory evidence on the necessity of the additional herbs and medicines that Farrow seeks, and the

16

health concerns articulated by the Defendants, the Court finds that Farrow has not demonstrated by substantial evidence that the Defendants have denied him a meaningful opportunity to practice his religion by denying access to the additional herbs and medicines that he requests.

D.    Daily Communal Prayer

Farrow complains that NASC is not scheduled for daily communal prayer. As addressed above, NASC is scheduled religious service and education time consistent with that provided to other faith groups. Susan Young testified that it would not be possible to provide daily communal prayer for every religious group given the scheduling needs of the facility. In addition, Shaulis testified that communal prayer on a daily basis is not essential to the practice of Farrow's religion. The evidence further showed that Farrow could engage in communal prayer during his free time if he and other NASC members desired. The Court finds that Farrow has not demonstrated by substantial evidence that the Defendants have denied him a meaningful opportunity to practice his religion by denying his request to schedule daily communal prayer for NASC.

17

E.   Traditional Foods and Special Religious Days

Farrow complains that NASC members are deprived of traditional foods and institutional recognition of special religious days.  In particular, Farrow testified that buffalo is particularly important as a spiritual food and that NASC was formerly able to obtain buffalo meat from a company that supplied it before NHDOC changes its rules.  He argues that NCF's policy is unreasonable because the members of NASC have offered to pay for the foods they seek.

Shaulis testified that the foods that are eaten in Native American feasts are the foods that are prevalent in the region at the time of year.  However, feasts are very common in Native American culture and traditional foods are not necessary to the practice of religion.  Still, NCF holds four religious feasts for NASC each year, which the evidence showed includes traditional Native American foods.  Farrow did not provide any evidence at the hearing to support his claim that the number of religious days scheduled for NASC are insufficient.

Susan Young testified that NASC is the only group that has been allowed to bring personal food items for their feasts.  NCF has moved to relying on the prison's culinary arts menu to

18

eliminate outside food coming into the prison to cut down on contraband and for health reasons. Neither inmates, nor their family members, are allowed to make donations to religious groups inside the prison. Young testified that donations are prohibited because they create the risk of coercion of inmates who are unable to donate to contribute in other ways. For example, an inmate could be pressured to serve as a runner for contraband.

The Court finds that Farrow has not demonstrated by substantial evidence that the Defendants have denied him a reasonable opportunity to practice his religion by denying NASC special religious days and traditional food. Farrow has neither demonstrated the number of religious feasts scheduled for NASC is inadequate, nor that NASC has been denied a reasonable amount of traditional foods.

F.    Permission to Wear Feathers at all Times

Farrow complains that he is not permitted to wear feathers at all times, but rather only during ceremonies. Shaulis testified that while feathers are integral to Native American religion, wearing them is not. Feathers are used in prayer and a feather acts as a fan for smudging. Feathers are also commonly used as adornment. Shaulis testified that an inmate could keep a

19

feather in his prayer or pipe bundle. The evidence showed that NCF's restriction on feathers is consistent with the policy applied to members of other faith groups. Inmates who have medallions or medicine bags, for example, are required to keep them in or under their clothing. The Court finds that Farrow has not demonstrated by substantial evidence that Defendants are denying him a reasonable opportunity to practice his religion by refusing to permit him to weather feathers at all times.

G.   Separate Meeting Times for Various Nations

Farrow complains that NCF does not allow the opportunity for the various Nations in the NASC group to meet separately, an opportunity provided to the various separate denominations of Christianity. He asserts that the Lakota, Abenaki and Mic Mac members are all forced to be part of the same group. Farrow testified that it is important that the members of the different Native American nations have their own prayer and culture time because the different nations have different languages and songs. In response, Defendants contend that there is a relatively small number of inmates who participate in NASC, as compared with other faith groups, and that the religious practices of the members within NASC are similar enough that a single group is sufficient.

Although the Plaintiff's argument has merit, there is not substantial evidence in the record to support his claim. Farrow did not argue or present any evidence that demonstrates that his own religious needs are going unmet. As Farrow is only prosecuting this case on his own behalf, I do not find, based on the current record, that Farrow has demonstrated that the Defendants are denying him a reasonable opportunity to practice his religion by recognizing only a single faith group for Native American religious practices at NCF.

As discussed above, I do not find from the evidence that Farrow has demonstrated that he is likely to succeed on the merits of any of his Free Exercise Clause claims. Therefore, I find that injunctive relief is not warranted on those claims.

III. RLUIPA Claim

Farrow raises the RLUIPA as another basis for granting him injunctive relief. 42 U.S.C. § 2000cc-1 states in relevant part:

> (a) General Rule. No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
>> (1) is in furtherance of a compelling governmental interest; and

21

> > (2) is the least restrictive means of
> > furthering that compelling governmental
> > interest.
>
> > (b) Scope of application.  This section applies in
> > any case in which –
>
> > > (1) the substantial burden is imposed in a
> > > program or activity that receives Federal
> > > financial assistance;[8] or
>
> > > (2) the substantial burden affects, or removal
> > > of that substantial burden would affect,
> > > commerce with foreign nations, among the
> > > several States, or with Indian tribes.

Thus, "RLUIPA protects prisoners and other institutionalized people from government infringement on their practice of religion."  Mayweathers v. Newland, 314 F.3d 1062, 1065 (9th Cir. 2002), cert. denied, 72 U.S.L.W. 3235 (U.S. Oct. 6, 2003) (No. 02-1655).  In order to establish a claim for violation of the RLUIPA, Farrow must demonstrate that the regulation in question: (1) imposes a substantial burden; (2) on the "religious exercise;" (3) of a person, institution, or assembly.  Grace United Methodist Church v. City of Cheyenne, 235 F. Supp. 2d 1186, 1193-94 (D. Wyo. 2002), citing Murphy v. Zoning Comm'n, 148 F. Supp. 2d 173, 187 (D. Conn. 2001).  If Farrow meets his burden, Defendants must show that the regulations further a

---

[8]Defendants stipulated that NHDOC receives federal funding.

compelling state interest by the least restrictive means.

Charles v. Verhagen, 220 F. Supp. 2d 937, 944 (W.D. Wis. 2002),

aff'd, 348 F.3d 601 (7th Cir. 2003).

Defendants argue that there is a substantial question regarding whether the RLUIPA is constitutional and that the RLUIPA ought not be used as a basis for granting Farrow preliminary injunctive relief.  See Cutter v. Wilkinson, 349 F.3d 257, 268-269 (6th Cir. 2003) (finding that the RLUIPA violates the Establishment Clause); Al Ghashiyah v. Dep't of Corr., 250 F. Supp. 2d 1016, 1034 (E.D. Wis. 2003) (same).[9]  There is no controlling First Circuit precedent on this issue.[10]

Defendants argue that even if the RLUIPA is constitutional, the Court should not find in Farrow's favor because he has not demonstrated that Defendants have created a "chilling effect" on his exercise of religion.  Defendants argue that they have recognized NASC as a faith group, and have provided its members

---

[9]Another case Defendants cite as support, Madison v. Riter, has been reversed.  See 240 F. Supp. 2d 582 (W.D. Va. 2003), rev'd and remanded by, -- F3d --, No. 03-6362, 2003 WL 22883629 at *9 (4th Cir. Dec. 8, 2003).

[10]Farrow has not responded to Defendants' arguments pertaining to the constitutionality of the RLUIPA.  The Court notes, however, that the United States Attorney's Office might wish to intervene in this case to defend the constitutionality of the statute.  See Fed. R. Civ. P. 24(c).

23

substantial and reasonable opportunities to practice their religion. Defendants further argue that compelling state interests support the specific denials in question.

The first element that Farrow must demonstrate in order to succeed on his RLUIPA claim is that the regulations enforced by the Defendants have imposed a substantial burden on the practice of his religion. Since the term "substantial burden" is not defined in the RLUIPA, courts have looked to the language used by courts in discussing "substantial burdens" in other contexts. See Murphy, 148 F. Supp. 2d at 188 (analyzing cases). Such cases have alternatively inquired whether a state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 718 (1981), whether a person is required to "choose between following the precepts of her religion and forfeiting the benefits, on the one hand, and abandoning the precepts of her religion . . . on the other," Sherbert v. Verner, 374 U.S. 398, 404 (1963), or whether state action "prevent[s] him or her from engaging in conduct or having a religious experience that is central to the religious doctrine," Bryant v. Gomez, 46 F.3d 948, 949 (9th Cir. 1995). In Charles v. Verhagen, the court found

24

persuasive the liberal definition of substantial burden employed by the Seventh Circuit in considering a claim under the Religious Freedom Restoration Act ("RFRA"):[11]

> a substantial burden on the free exercise of religion . . . is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs.

Charles, 220 F. Supp. 2d 937, 944-945 quoting Mack v. O'Leary, 80 F.3d 1175 (7th Cir. 1996), judgment vacated and remanded by O'Leary v. Mack, 522 U.S. 801 (1997). The Seventh Circuit found it appropriate to give the term "substantial burden" a "generous definition" to avoid making judges "arbiters of religious law." Mack, 80 F.3d at 1179.

The Court finds that the "chilling effect" standard advanced by Defendants defines the court's inquiry too narrowly. A generous definition of "substantial burden" as discussed in Mack appears to be required, particularly in light of the express language in the RLUIPA that a religious exercise need not be "compelled by or central to a system of religious belief" in order to be covered by the statute. 42 U.S.C. § 2000cc-5(7)(A).

---

[11]The RFRA is the predecessor to the RLUIPA. The Supreme Court held that the RFRA is unconstitutional as applied to the states in City of Boerne v. Flores, 521 U.S. 507 (1997).

25

Even using a liberal definition of "substantial burden," however, the Court finds that Farrow has not demonstrated that the Defendants have imposed a substantial burden on his religious exercise except with regard to his request for access to a sweat lodge. Though perhaps not a central tenet of Farrow's religion, the evidence shows that the use of sweat lodge is a widely-practiced Native American religious exercise. Defendants have not contested that Farrow's request for access to a sweat lodge emanates from a sincerely-held religious belief. Therefore, the Court must consider whether the Defendants have articulated a compelling state interest for denying Farrow's request.

Defendants have refused to provide a sweat lodge citing the heavy institutional burden of its construction and maintenance, and the need for intensive monitoring. These concerns are not insubstantial. The evidence demonstrated that a sweat lodge would have to be constructed on land designated off limits to the rest of the prison population, with specific dimensions, and under the supervision of a competent Native American practitioner. Defendants contend that the wood used in a sweat lodge is usually not precut, which would require inmates to have access to tools that would create security concerns. While using

26

the sweat lodge, inmates would be in a state of undress, and completely out of sight of the prison's security staff. This raises concerns about potential inappropriate behavior. The Court finds these countervailing interests compelling.

Farrow argues that the maintenance of sweat lodges at as many as thirty others prisons shows that Defendants' security concerns are overstated. He argues that all of the raw materials for the sweat lodge could be donated, and that the prison already employs a person on its staff who could oversee its construction. Farrow further argues that the inmates could go into the sweat lodge wearing gym shorts, which would eliminate any concern about indecent exposure, and that the members of NASC could reasonably be expected to behave appropriately inside of the sweat lodge. Notwithstanding the reasonableness of these arguments, Farrow has not produced substantial evidence to support his assertions.

The Court finds that further development of the record on the costs and security risks in maintaining a sweat lodge, and whether there are less restrictive alternatives to complete denial of access, is required. Therefore, the Court recommends that Farrow's request for interim injunctive relief on his RLUIPA claims be denied.

CONCLUSION

For the reasons set forth above, I recommend that Farrow's Motion for a Temporary Restraining Order and a Preliminary Injunction (document no. 8) be denied. I further recommend that the court notify the Attorney General of the United States that the Defendants have challenged the constitutionality of the RLUIPA in this action, and invite the United States to intervene pursuant to 28 U.S.C. § 2403 and Fed. R. Civ. P. 24(c).

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____
James R. Muirhead
United States Magistrate Judge

Date:   February 5, 2004

cc:     Prayer Feather Farrow, pro se.
        Michael K. Brown, Esq.

28